CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

CHRISTIAAN H. HIGHSMITH (CABN 296282)
Assistant United States Attorney

　　450 Golden Gate Avenue, Box 36055
　　San Francisco, California 94102-3495
　　Telephone: (415) 436-7200
　　FAX: (415) 436-7234
　　christiaan.highsmith@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 23-CR-00106-005 RS |
| Plaintiff, | **UNITED STATES' SENTENCING MEMORANDUM** |
| v. | |
| DOMENICK NARDONE, | Hearing Date:　Tuesday, April 21, 2026 |
| Defendant. | Hearing Time:　9:30 a.m. |
| | Court:　　　Hon. Richard Seeborg |

　　　　Domenick Nardone is convicted of abusing a position of power and authority to conceal a criminal kickback fraud scheme at two companies where he served as the Chief Financial Officer. Rather than using his authority as CFO to stop the fraud, Nardone took affirmative steps to conceal it. And as part of a law enforcement investigation into the fraud scheme, Nardone repeatedly tried to improperly influence a subordinate's testimony. Nardone benefitted indirectly from the fraud scheme. As the part owner of both companies involved in the scheme, Nardone benefitted from the additional revenue the scheme generated for his companies. Nardone committed his crime even though as CFO he was responsible for detecting and reporting fraudulent financial activity. Accordingly, a short custodial sentence is necessary to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

　　　　For the reasons set forth in more detail below, the United States recommends that the Court

USA SENTENCING MEMO　　　　　　1
23-CR-00106-005 RS

sentence Nardone to a short term of imprisonment – no more than 4 months.  This should be followed by a one-year term of supervised release. The court should also impose a fine of $200,000, as well as a special assessment of $100.

## I.    OFFENSE CONDUCT

The offense conduct is summarized in the parties' Plea Agreement (Dkt. #181) and PSR ¶¶ 11-22. From 2001 through 2025, Nardone was the CFO of a New Jersey company that sold forklifts and provided forklift servicing, parts, and operations training as well as warehouse logistics and operations services. Nardone owned 4% of the company. From 2018 through 2025, Nardone was the CFO of a second New Jersey company that sold and installed warehouse racking systems. He owned 20% of the company. Williams Sonoma, Inc. (WSI) was a major customer of both New Jersey companies.

In approximately October 2018, Nardone learned that Michael Podhurst, the Vice President of Sales at the two New Jersey companies, had arranged for the companies to hire as a consultant Eric Marsiglia and his consulting company REM Group to help the New Jersey companies retain existing WSI business, to win additional WSI business, and win other business. Nardone did not know that Marsiglia was a WSI employee. Nevertheless, Nardone understood that the New Jersey companies were paying Marsiglia a portion of the profits earned from WSI-related work. Podhurst approved the New Jersey companies' payments to Marsiglia, which were paid to REM. Nardone was aware of the payments and specifically approved some of them, including the first payment to REM.

In addition, Nardone tracked the New Jersey companies' payments to Marsiglia. In 2019, on multiple occasions, Nardone directed the forklift company's controller to analyze the relationship between profits and revenue earned from WSI business and payments to Marsiglia. On July 24, in response to a request by Nardone, the forklift company's controller emailed Nardone a spreadsheet showing that the New Jersey companies had earned more than $10 million from a significant WSI job that resulted in more than $3.9 million in profit. The controller further described the "profit split" as a 52% "portion" amounting to more than $1.9 million for the New Jersey companies and a 48% "portion" amounting to more than $1.7 million for Eric Marsiglia and REM.

Two months later, in September 2019, Nardone characterized the New Jersey companies' "deal with REM [as] one third of revenues." In short, Nardone understood that his WSI generated millions of

USA SENTENCING MEMO                    2
23-CR-00106-005 RS

dollars in annual revenue for the New Jersey companies and that the New Jersey companies were sharing one-third of WSI-related revenue with Marsiglia via REM.

By no later than March 2020, Nardone knew that Marsiglia exercised significant influence over WSI's business decisions and that Marsiglia had the power to stop WSI from purchasing the New Jersey companies' forklifts and warehouse services. On March 24, 2020, the forklift company's controller emailed Nardone to say that WSI had just paid the forklift company $839,000. Nardone responded the same day: "Money money money…does this mean we need to pay eric[?]" Shortly thereafter, Nardone sent his controller a second email referring to WSI's $839,000 payment and Marsiglia: "With that kind of money we're going to need to pay him [Marsiglia] something substantial … he approved the payment and he can stop payments."

Nardone continued tracking the New Jersey companies' payments to Marsiglia. On September 2, 2020, Nardone directed his subordinates at the New Jersey companies to provide "the latest on Eric and or whatever Companies we pay him commissions from for … 2019 and 2020." The racking company controller responded by stating that the racking company had paid Marsiglia $528,000 in 2019 and $228,000 in 2020. The forklift company controller reported to Nardone that the company had paid Marsiglia more than $2.9 million in 2019, nearly $1 million so far in 2020, and owed Marsiglia an additional $69,000 on unpaid invoices. Nardone reported the 2019 and 2020 payments to Marsiglia to his CEO.

By March 2020, Nardone was aware of a high probability that Marsiglia and Podhurst were committing fraud by concealing the New Jersey companies' payments to Marsiglia – made out to REM rather than Marsiglia personally – from WSI. However, rather than investigate, report, or stop the fraud, Nardone continued allowing Podhurst to approve payments to Marsiglia via REM in connection with WSI work. From March 24, 2020, through January 12, 2021, when the payments to Marsiglia stopped, the New Jersey companies paid Marsiglia a total of $934,313 via REM. Nardone admitted in his plea agreement that he should have known these payments were the proceeds of fraud.

Furthermore, after federal authorities began investigating a potential kickback fraud scheme involving the New Jersey companies, Nardone took affirmative steps to conceal the fraud scheme rather than reporting it to federal authorities. In February 2023, the New Jersey companies received a subpoena

from federal law enforcement. In connection with the investigation into the New Jersey companies' payments to Marsiglia, Nardone tried to improperly influence the forklift company's controller – Nardone's direct report – to alter his recollection about the forklift company's payments to REM and communications with and involving Marsiglia. Nardone tried to pressure the controller to adopt Nardone's version of the timeline of relevant events, and Nardone tried to ensure that the controller was "on the same page" as Nardone about what happened. Nardone admitted in his plea agreement that he tried to improperly influence the controller's statements as part of the law enforcement investigation.

## II.    GUIDELINES

### A.    The Government's Guidelines Calculations

The government agrees with the U.S. Probation Office's advisory Guidelines calculations in the PSR, ¶¶ 27-35, as set forth below:

| | |
|---|---|
| Base Offense Level, U.S.S.C. § 2X4.1 | 11 |
| Adjustment for Abuse of Position of Trust/Special Skill, U.S.S.C. § 3B1.3 | +2 |
| Zero-point offender, U.S.S.C. § 4C1.1 | -2 |
| Acceptance of Responsibility, U.S.S.C. § 3E1.1(a) | -2 |
| Total Offense Level | 9 |

Given that Nardone falls within Criminal History Category I, the government and Probation agree that the applicable Guidelines range is 4-10 months in prison. PSR ¶ 63.

## III.    SENTENCING RECOMMENDATION

The government submits that a short custodial sentence is appropriate and necessary here. The two critical factors in the government's recommendation are (1) that Nardone abused his position of significant power and authority as CFO to cover up a fraud rather than investigating and reporting it, and (2) the need for general deterrence in cases involving complex corporate fraud involving high-level executives.

### A.    Nature and Circumstances of the Offense and the Need to Impose a Sentence that Reflects the Seriousness of the Offense

The government's sentencing recommendation acknowledges the low advisory Guidelines range and the fact that Nardone stands convicted of misprision of a felony (essentially, covering up a crime committed by others) rather than commission of the fraud scheme itself. Nonetheless, a custodial

sentence is necessary to reflect the seriousness of the fact that a CFO charged with preventing fraud chose to cover it up. Indeed, the PSR characterizes Nardone's conduct as "a serious offense." PSR, Sentencing Recommendation, at 2. Nardone both continued to approve payments that he should have known were part of a fraud scheme, and he twice attempted to improperly influence the statements of his subordinate – the forklift company controller – in connection with a law enforcement investigation. As CFO, Nardone exercised significant power and authority, and he enjoyed significant discretion and trust. He could have stopped a fraud scheme in its tracks. Instead, he abused his position. Nardone undermined the trust that employers, employees, and the public have in fair business competition.

### B.    History and Characteristics of the Defendant

Nardone is a zero-point offender, unlikely to recidivate, he is 68 years old, and he suffers from chronic disc degeneration and varicose veins. These factors weigh against a significant custodial sentence.

On the other hand, Nardone committed the crime in this case despite the advantages conferred by a happy middle-class upbringing, positive relationship with both of his parents, a college education, notable professional achievement, and significant financial success. Despite his accomplishments, advantages, and the power, authority, and responsibility of being a corporate executive and part owner at two companies, Nardone took steps to conceal a fraud scheme, and he tried to improperly influence a subordinate's statements in connection with a law enforcement investigation. Nardone exploited his position of power and authority at the height of his professional career. These factors, plus the need for general deterrence in cases involving corporate crime, weigh in favor of a custodial sentence.

### C.    Need to Promote Respect for the Law, Protect the Public, Provide Just Punishment, and Provide Adequate Deterrence

A short custodial sentence is necessary in this case to provide adequate general deterrence. General deterrence in cases involving corporate crime is especially important because corporate crime is difficult to detect and because custodial sentences impact the choices of other corporate executives facing similar situations and circumstances. Another CFO aware of a fraud scheme involving his company, but benefitting economically from it, may look at this case as part of his decision-making. A custodial sentence – even a short one – will serve as an important deterrent to covering up a financial

crime rather than reporting it. Further, a custodial sentence will serve as an important deterrent to corporate executives involved in a law enforcement investigation who are considering whether to attempt to influence the statements of their subordinates as part of the investigation. As other Courts have said, "economic and fraud based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity," and, thus, "are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Id.* The government believes that a non-custodial sentence will provide inadequate deterrence given the specific facts of Nardone's conduct in this case.

**IV.     RESTITUTION**

There is no restitution in this case.

**V.      FINE & COMMUNITY SERVICE**

The United States agrees with Probation that a $200,000 fine is appropriate in this case. The government also agrees with Probation that the defendant should complete 100 hours of community service.

**VI.     CONCLUSION**

The United States respectfully requests that the Court sentence Defendant Domenick Nardone to a short term of imprisonment – no more than four months. The Court should also order the defendant to serve a one-year term of supervised release, with the conditions recommended by the Probation Office in its PSR Sentencing Recommendation. The United States requests that the Court order the defendant to pay a fine of $200,000 and a special assessment of $100.

DATED:        April 14, 2026                          Respectfully submitted,

                                                      CRAIG H. MISSAKIAN
                                                      United States Attorney


                                                            /s/
                                                      CHRISTIAAN H. HIGHSMITH
                                                      Assistant United States Attorney